UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Paul Gracey,
Plaintiff,

v. : File No. 1:06-CV-134

Robert Hofmann, Paul Cotton,
Defendants.

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
(Papers 40 and 41)

Plaintiff Paul Gracey, a Vermont inmate proceeding *pro se* and *in forma pauperis*, brings this action claiming that the defendants abruptly stopped providing him psychiatric medication after he allegedly threatened defendant Paul Cotton, M.D. Pending before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, I recommend that Gracey's motion for summary judgment be DENIED, the defendants' motion for summary judgment be GRANTED, and this case be DISMISSED.

Factual Background

At all times relevant to this case, Gracey was in the care and custody of the Vermont Department of Corrections ("DOC"). Defendant Paul Cotton, M.D. provided mental health services to prison inmates

pursuant to a contract with the DOC. Dr. Cotton has not provided such services to DOC inmates since February 14, 2006. The facts of this case focus on events in 2005. Defendant Robert Hofmann is the DOC Commissioner.

Gracey has a history of mental illness. As of August 5, 2005, he was taking a drug called Klonopin, which is used to control panic attacks, seizures and anxiety. Gracey was also taking Seroquel, which is often used to treat schizophrenia or bipolar disorder. In low doses, like those prescribed in this case, Seroquel can have a mild sedative effect for patients with anxiety.

In July or early August 2005, Gracey met with Dr. Kraig Libstag and informed him that he was experiencing anxiety and paranoia. Dr. Libstag contacted Dr. Cotton, who ordered that Gracey's dosage of Klonopin be increased from .5 mg twice a day to 1.0 mg twice a day.

On August 8, 2005, Gracey threatened a Corrections Officer with a razor blade. The next day he threatened a second Corrections Officer. He also destroyed a computer and threw food from his cell. Due to Gracey's aggressive behavior, Dr. Cotton immediately prescribed Atarax, a drug used to relieve anxiety and tension.

On August 10, 2005, Gracey was placed in "Delta Unit" for security reasons. When seen there by Dr. Libstag, Gracey reported that he was feeling paranoid, was hearing voices in his head, and that he was overwhelmed by thoughts that he might hurt himself or others. He also stated that he had begun a hunger strike. Dr. Libstag consulted with Dr. Cotton, who telephoned an order for Zyprexa, another drug used to treat anxiety.

Dr. Cotton met with Gracey on August 11, 2005. Among the matters discussed were charges pending against Gracey arising out of a prison riot that occurred while Gracey was incarcerated in Kentucky. In his notes, Dr. Cotton wrote that Gracey's recent actions were most likely due to stress related to the pending charges, and that Gracey did not have a "serious mental illness." (Paper 41-4 at 5). Dr. Cotton also remarked that "strikingly [Gracey's] difficulties recently have been unrelieved by medication changes," and therefore discontinued some of the prescribed medications. Dosages of Seroquel and Klonopin (referred to in the notes as Clonazepam) were returned to pre-August 5 levels.

On August 16, 2005, Gracey met with another member of the mental health team, Lauren Schlom. In his meeting with Schlom, Gracey expressed his desire to be moved to the Alpha Unit, and asked for his "meds." When speaking about Dr. Cotton, Gracey became agitated and stated that he was "going to do something to that doctor." (Paper 41-4 at 6).

During a meeting with Dr. Libstag on August 17, 2005, Gracey explained that he was in the twelfth day of his hunger strike and was continuing to refuse food. Dr. Libstag concluded that Gracey was agitated and possibly delusional, and that he would contact Dr. Cotton about Gracey's mental status. Dr. Libstag also ordered 15-minute suicide checks. Id. at 7.

Dr. Libstag met with Gracey again on August 18, 2005, and Ms. Schlom saw Gracey each weekday between August 19 and August 23, 2005. When Schlom informed Gracey that mental health staff would be seeing him daily, Gracey threatened her and warned her not to return. Despite threats of violence, both Dr. Libstag and Dr. Cotton saw Gracey on August 24, 2005. Dr. Cotton visited Gracey again on August 25, 2005.

After the August 25, 2005 meeting, Dr. Cotton concluded that Gracey's medications should be stopped. He reached this conclusion after consultation with Dr. Upton, another psychiatrist on the mental health staff. In an affidavit submitted in support of the defendants' summary judgment motion, Dr. Cotton explains his decision that the Seroquel should be stopped "as it was not helping Mr. Gracey control his anger." (Paper 41-3 at 5). With respect to the Klonopin, Dr. Cotton decided that "even though [Gracey] was getting a very small dose of Klonopin, continued use . . . was keeping him from managing his impulsive response to situations." Id. Dr. Cotton reports that Dr. Upton agreed with this conclusion, and that the Klonopin was, therefore, stopped "at least until Paul Gracey's behavior stabilized." Id.

Gracey claims that Dr. Cotton stopped his medications in retaliation for the threats Gracey made against him. He also contends that the Klonopin should not have been summarily discontinued, and instead should have been tapered. The complaint alleges that, "[b]eginning shortly after abrupt discontinuation of plaintiff's medications, plaintiff . . . suffered panic

attacks, sleep disorders, and psychotic episodes which include hallucinations, paranoia, and extreme anxiety." (Paper 3 at 6). Other alleged symptoms included: increased nervousness; agitation; difficulties concentrating and dealing with people; severe headaches; stomach cramping; muscle aches and joint pain. Id.

On the day that Dr. Cotton ordered the stoppage, Gracey filed a grievance against him for withdrawing his medications. In the following weeks, Gracey asked to see medical staff for issues relating to neck pain, canker sores, his scalp and a possible kidney stone. There is no mention in the record of any of the ailments Gracey now claims to have suffered during that time.

Dr. Cotton next met with Gracey on September 19, 2005, by which time Gracey had ended his hunger strike. Gracey reportedly explained to Dr. Cotton that he wished his medications had been restored after he began eating and drinking again, to which Dr. Cotton responded that Gracey needed to request a visit if he wanted medical attention. In his progress notes, Dr. Cotton wrote that Gracey's mood was calm and that he was "participating in unit activity." (Paper 41-4 at 12). He also noted that

the issue of Gracey's extradition to Kentucky had been resolved. Dr. Cotton ordered that Seroquel and Klonopin be restarted.

Gracey is now suing for the negative effects he allegedly suffered between August 25 and September 19, 2005 as a result of his medications being discontinued. The defendants have moved for summary judgment, arguing that Gracey has not shown deliberate indifference, has failed to offer evidence that he suffered harm during the period in question, and has offered no expert evidence to show that Dr. Cotton deviated from the standard of care.

## Discussion

### I. Summary Judgment Standard

Summary judgment should be granted only when there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that there is no genuine issue of material fact. See Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (stating

that movant may meet burden by "point[ing] to an absence of evidence to support an essential element of the nonmoving party's claim."). Once the movant satisfies this burden, the non-moving party must respond by setting forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In determining whether summary judgment is appropriate, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 126 (2d Cir. 2004). "In addition, *pro se* litigants must be given extra latitude, particularly on a summary judgment motion." Thomas v. New York State Dep't of Corr. Servs., 2006 WL 435718, at *4 (S.D.N.Y. Feb. 23, 2006) (citing McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (*pro se* pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest")).

II. Eighth Amendment Claim

The Eighth Amendment "imposes a duty upon prison officials to ensure that inmates receive adequate medical

care." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 832, 844 (1994)). "Yet not every lapse in medical care is a constitutional wrong. Rather, 'a prison official violates the Eighth Amendment only when two requirements are met.'" Id. (quoting Farmer, 511 U.S. at 834).

The first requirement is an objective one: whether the alleged deprivation is "sufficiently serious." Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).

> Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Salahuddin, 467 F.3d at 279-80 (citations and internal quotation marks omitted).

The objective test also asks whether the inadequacy in medical care was sufficiently serious. Id. at 280.

"This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Id. (citing Helling v. McKinney, 509 U.S. 25, 32-33 (1993)). When, as in this case, an allegation concerns an interruption in treatment, "the seriousness inquiry 'focus[es] on the challenged delay or interruption rather than the prisoner's underlying medical condition alone.'" Id. (quoting Smith v. Carpenter, 316 F.3d 178, 185-86 (2d Cir. 2003).

The second requirement for an Eighth Amendment violation is subjective: the defendant must have acted with a sufficiently culpable state of mind. Id. (citing Wilson, 501 U.S. at 300).

> In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not

> desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

Id. (citations omitted). As this test suggests, the official must be subjectively aware that his conduct creates a risk. Id. at 281 (citing Farmer, 511 U.S. at 837). At summary judgment, a defendant may offer evidence that he was "not so aware, such as testimony 'that [he] knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.'" Id. (quoting Farmer, 511 U.S. at 844). "The defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere. Thus, even if objectively unreasonable, a defendant's mental state may be nonculpable." Id.

In this case, the defendants cite record evidence that Gracey received almost daily care during the weeks leading up to the Dr. Cotton's decision to discontinue Seroquel and Klonopin. This evidence, they argue, weighs against a finding of deliberate indifference. The

defendants further submit that Gracey did not complain about negative effects of withdrawal during the period in which his medications were discontinued. Finally, the defendants have submitted an expert report supporting Dr. Cotton's decisions and conclusions with respect to the discontinuation of Seroquel and Klonopin.

Gracey does not argue a lack of care prior to August 25, 2005. His claim is that Dr. Cotton abruptly withdrew his medications, thus evidencing deliberate indifference to his needs. According to the test set forth above, the first question is whether the alleged deprivation was sufficiently serious. Specifically, the Court must inquire into whether the discontinuation of medications caused serious harm.

Gracey submits in his complaint that he suffered a wide array of harms as a result of being pulled off his medications. Beyond his own self-serving assertions, however, he has offered no evidence to support his claims. In contrast to the allegations in the complaint, the documents for that period of time show that Gracey's requests for medical attention did not cite any of the harms he now claims to have suffered. While the

complaint alleges that Gracey suffered from anxiety, paranoia and psychotic episodes, the medical records show complaints about neck pain, canker sores, a possible kidney stone and scalp issues.

It is well established that "a *pro se* party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment." Hernandez v. McGinnis, 223 F. Supp. 2d 223, 225 (W.D.N.Y. 2003). Here, Gracey has not offered any admissible evidence to support his claim of serious harm. Accordingly, he has failed to raise any triable issue of fact on this issue. See, e.g., Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990) (holding that self-serving affidavit repeating conclusory allegations in complaint is insufficient to preclude summary judgment); Samules v. Erns, 2004 WL 2978285, at *2 (S.D.N.Y. Dec. 20, 2004) (plaintiff's self-serving conclusory statements, unsupported by evidentiary proof, insufficient to satisfy burden of proof at summary judgment).

As to the subjective portion of the test, there is again insufficient evidence that Dr. Cotton acted with a sufficiently culpable state of mind. Gracey submits two

pieces of evidence to support his claim. First, he has attached to the complaint documentation about the drugs Klonopin and Seroquel. Gracey does not cite to any passages in these materials warning against sudden stoppages, although the Klonopin document states that "you may experience withdrawal." (Paper 3-2 at 2). Gracey has also submitted a physician's order from 2006 requiring that Klonopin be tapered down from a daily dosage of 2.75 mg to discontinuation over a period of three weeks. (Paper 34 at 2).

Relevant to this latter piece of evidence, both Dr. Cotton and the defendants' expert, Dr. Jerome Rogoff, explain that the dose of Klonopin being given to Gracey as of August 25, 2005 was the lowest dose manufactured. (Paper 41-3 at 6); (Paper 41-22 at 10). Dr. Rogoff further opined that "[w]ithdrawal symptoms are almost always directly related to size of the dose and its duration at the time of cessation." (Paper 41-22 at 10). Consistent with this statement, Dr. Cotton states in his affidavit that "it was not really practical to taper the Klonopin. Mr. Gracey was already getting the smallest dose that was manufacture: 0.5 mg pills. In my judgment,

no doctor would foresee any harm to Mr. Gracey by discontinuing this already small dose." (Paper 41-3 at 6).

With respect to both the Seroquel and the Klonopin, Dr. Cotton has provided thorough and reasonable explanations for his decision to discontinue both medications. Moreover, he consulted with another physician at the time, and his conclusions have been endorsed by the defendants' expert. Although Gracey's evidence suggests that, in some circumstances, tapering off of medications might be the preferred practice, his evidence is not persuasive under the facts of this case. Moreover, even if Dr. Cotton's decision was erroneous, there is nothing in the record, beyond Gracey's speculation, to suggest that he was acting in a manner that violated the Eighth Amendment.

In sum, this Court should find that the record evidence does not raise a genuine factual question concerning whether Gracey suffered sufficiently serious harm, or whether Dr. Cotton acted with deliberate

indifference.[1] On a motion for summary judgment, unlike on a motion to dismiss, Gracey "must actually point to record evidence creating a genuine dispute . . . . This he has not done." Salahuddin, 467 F.3d at 282. I therefore recommend that Gracey's motion for summary judgment be DENIED, and the defendants' motion for summary judgment be GRANTED.

Conclusion

For the reasons set forth above, I recommend that Gracey's motion for summary judgment (Paper 40) be DENIED, the defendants' motion for summary judgment (Paper 41) be GRANTED, and this case be DISMISSED.

Dated at Burlington, in the District of Vermont, this 3rd day of December, 2007.

/s/ Jerome J. Niedermeier
Jerome J. Niedermeier
United States Magistrate Judge

Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically

---

[1] The defendants also argue that Gracey has failed to produce expert evidence with respect to the relevant standard of care. As this is an Eighth Amendment case, and not a negligence action, medical appropriateness is not the primary issue and no such expert is required. See Olivier v. Robert L. Yeager Mental Health Ctr., 398 F.3d 183, 191 n.7 (2d Cir. 2005); Hathaway v. Coughlin, 37 F.3d 63, 68 (2d Cir. 1994).

identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. Failure to file objections within the specified time waives the right to appeal the District Court's order. See Local Rules 72.1, 72.3, 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).